UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARTHUR NEWBY, *pro se* | ) | |
| | ) | |
| Plaintiff, | ) | 07 C 6953 |
| | ) | |
| vs. | ) | Honorable Joan H. Lefkow |
| | ) | |
| SALVADOR GODINEZ | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT'S EXHIBIT

# A

Plaintiff's Deposition Transcript

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTHUR NEWBY,

    Plaintiff,

    -vs-    No. 07 C 6953

SALVADOR GODINEZ,

    Defendant.

    The Deposition of ARTHUR NEWBY taken before THOMAS A. MANNO, C.S.R. and Notary Public within and for the State of Illinois, pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Court, pertaining to the taking of depositions, taken at Cook County Jail, Division IX, 3rd Floor, Chicago, Illinois 60608, at the hour of approximately 10:00 o'clock a.m. on May 23rd, 2008.

## Page 2

APPEARANCES:

ARTHUR NEWBY,

    the Plaintiff, appeared pro se;

STATE'S ATTORNEY OF COOK COUNTY,
RICHARD A. DEVINE, By
Mr. Romano DeBenedetto
Room 500 Daley Center
Chicago, Illinois 60602
312-603-4634

    Appeared on behalf of the Defendant.

## Page 3

INDEX

WITNESS:    PAGE:

Arthur Newby

Examination by Mr. DeBenedetto    5

No exhibits were marked.

## Page 4

MR. DeBENEDETTO: Before we begin, sir, for the record, Romano DeBenedetto.

You did ask me when I walked in here a few minutes ago whether or not I was your attorney.

Before we keep going, I need to advise you that I am not your attorney. I am the attorney for Mr. Godinez, against whom you brought a lawsuit.

Do you understand what I'm telling you?

THE WITNESS: Yes.

MR. DeBENEDETTO: That having been said, as you can see, sitting next to you is a court reporter. He is taking down everything that I say and everything that you say.

Do you understand that?

THE WITNESS: Yes.

MR. DeBENEDETTO: Would you swear in the deponent?

(Witness sworn.)

ARTHUR NEWBY, being first duly sworn, was examined and testified as follows:

EXAMINATION

By MR. DeBENEDETTO:

Q. As you indicated before, you understand that

Page 5

1 the court reporter is taking down everything you say,
2 correct?
3   A.  Right.
4   Q.  You need to understand a few things, too.
5       Obviously because there's a court reporter here
6 taking what you say down, what you say here today, and
7 what the court reporter is recording, can be used in
8 court.
9       Do you understand that?
10  A.  Right.
11  Q.  And when I say "can be used in court,"
12 specifically can be used in the lawsuit which you filed.
13      Do you understand that?
14  A.  Right.
15  Q.  Okay. The reason I'm here today is because I'm
16 going to be asking you questions about a lawsuit which
17 you've filed in the Northern District of Illinois
18 entitled Newby versus Godinez, Case No. 07 C 6953.
19      Do you understand that?
20  A.  Correct. Right.
21  Q.  Have you ever given a deposition before?
22  A.  No.
23  Q.  Have you ever testified in court before?
24  A.  Once.

Page 6

1   Q.  Basically the way a deposition works is
2 essentially the way you testify in court.
3       I'm going to be asking you questions, and all
4 you simply need to do is listen to my question, and if
5 you understand my question, answer the question.
6       Do you understand that?
7   A.  Yes.
8   Q.  If for some reason I ask something that you
9 don't understand or you're a little unclear about, you
10 can ask me to rephrase it or repeat the question and I
11 will be glad to do so.
12      Do you understand that?
13  A.  Right.
14  Q.  In the event that you do answer my question, I
15 have to assume that you understood my question.
16      Do you understand that?
17  A.  Yes.
18  Q.  If at any point you need a break for whatever
19 reason -- if you need a glass of water, you need to use
20 the washroom, you just want to take a breather -- you can
21 just indicate to me that you need a break and you'll be
22 given a break.
23      Do you understand that?
24  A.  Right.

Page 7

1   Q.  The only caveat, the only stop to doing that is
2 if I've already asked you a question, you answer the
3 question first, and then you can take your break.
4       Do you understand that?
5   A.  Right.
6   Q.  Is there anything about what I've just said
7 that you don't understand?
8   A.  No.
9   Q.  Okay. And you understand that you've been
10 sworn to tell the truth in this deposition, correct?
11  A.  Right.
12  Q.  Okay. For the record then, can you state and
13 spell your full name?
14  A.  Arthur Newby. A-R-T-H-U-R. Last name
15 N-E-W-B-Y.
16  Q.  Okay. As you sit here right now, are you under
17 the influence of any sort of drug or medication?
18  A.  No, sir.
19  Q.  Alcohol? Are you under the influence of that
20 right now?
21  A.  No, sir.
22  Q.  What's your date of birth, sir?
23  A.  April 27th, '83.
24  Q.  What's your Social Security Number?

Page 8

1   A.  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.
2   Q.  Where were you born?
3   A.  In Memphis, Tennessee.
4   Q.  How old are you?
5   A.  25.
6   Q.  Now you said you were born in Memphis.
7       How long did you live in Memphis for?
8   A.  Since I was like four, and then I moved up
9 here.
10  Q.  So from the age of when you were born to about
11 four years old, you lived in Memphis?
12  A.  Uh-huh. I grew up in Chicago.
13  Q.  There's one other rule I did forget to tell you
14 that I'll tell you right now.
15      It's a deposition, and I know we're in a small
16 room, so it tends to look like a conversation, but it's
17 really not in this sense.
18      He needs to take down what I say and he needs
19 to take down everything you say.
20      What that means is, you have to let me finish
21 my question before you answer it, and you need to do so
22 even if you kind of figure out what the question is going
23 to be.
24      Do you understand that?

**Page 9**

1    A. Yes.
2    Q. Okay. So then at about the age of four you
3    moved into the Chicago area.
4    How far have you gone in school, sir?
5    A. 10th grade.
6    Q. Where did you leave the 10th grade from? What
7    school were you at in the 10th grade?
8    A. Manley High School.
9    Q. Manley High School -- that's in the Chicago
10   area?
11   A. Yes.
12   Q. As best as you can remember, and I know that
13   you were young, but when you moved here when you were
14   four, where did you live in the Chicago area?
15   A. On the west side.
16   Q. On the west side?
17   A. Yes.
18   Q. Do you remember the address you lived at?
19   A. No, sir.
20   Q. What's the first address you remember living
21   at?
22   A. 3845 West Van Buren.
23   Q. And how old were you when you lived at
24   3845 West Van Buren?

**Page 10**

1    A. Probably seven.
2    Q. Seven years old?
3    A. Yes.
4    Q. Who did you live there with?
5    A. My mother and father.
6    Q. Anybody else?
7    A. My three brothers and three sisters.
8    Q. Anybody else?
9    A. That's it.
10   Q. How long did you live at 3845 West Van Buren?
11   A. Until I was like 10.
12   Q. At 10 years old, where did you live after that?
13   A. I don't remember the address.
14   Q. What's the next address you remember living at?
15   A. 4040 West Monroe.
16   Q. How old were you when you lived there?
17   A. From 13 to now.
18   Q. Until when?
19   A. Until now.
20   Q. Is that a house or an apartment?
21   A. That's an apartment.
22   Q. Which apartment do you stay at?
23   A. First floor.
24   Q. Who did you live there with?

**Page 11**

1    A. My sisters.
2    Q. Your sisters?
3    A. Yes.
4    Q. Anybody else?
5    A. And my brother.
6    Q. One brother?
7    A. Yes. And my father.
8    Q. Anybody else?
9    A. That's it.
10   Q. Are there any other addresses that you remember
11   living at besides the one you've just given me?
12   A. The one they stay at now is -- I forget. I
13   don't remember off the top.
14   Q. Listening again, in terms of places you've
15   lived at, are there any other addresses that you remember
16   living at besides the ones you have told me already?
17   A. No.
18   Q. You mentioned your mother. What's your
19   mother's name?
20   A. Huberta Newby.
21   Q. Could you spell it?
22   A. H-U-B-E-R-T-A.
23   Q. What's your father's name?
24   A. Arthur.

**Page 12**

1    Q. You said you have three brothers?
2    A. Yes.
3    Q. What are their names?
4    A. McArthur, Johnny, and Travis.
5    Q. McArthur, Johnny, and who?
6    A. Travis.
7    Q. Oh, Travis. Thank you.
8    What are your sisters' names?
9    A. Alicia, Felicia, and Vontasha.
10   Q. Are you married or single?
11   A. Single.
12   Q. Have you ever been married?
13   A. No.
14   Q. Do you have any children?
15   A. Three.
16   Q. What are their ages?
17   A. Four, five, and seven.
18   Q. What's the four-year-old's name?
19   A. Natasha.
20   Q. I'm sorry. I didn't hear you.
21   A. Natasha.
22   Q. Newby I assume her last name is?
23   A. Yes.
24   Q. And what's your five-year-old's name?

**Page 13**

| | | |
|---|---|---|
| 1 | A. | Carrie. |
| 2 | Q. | Newby? |
| 3 | A. | Yes. |
| 4 | Q. | And the seven-year old? |
| 5 | A. | Chew. |
| 6 | Q. | Who? |
| 7 | A. | Chew. Like you chew gum. |
| 8 | Q. | Okay. Carrie, is that a girl or a boy? |
| 9 | A. | All of them girls. |
| 10 | Q. | They're all girls? |
| 11 | A. | Yes. |
| 12 | Q. | They all have the same mother? |
| 13 | A. | No. Different mothers. |
| 14 | Q. | Who is Natasha's mother? |
| 15 | A. | Paris. |
| 16 | Q. | Paris what? |
| 17 | A. | I don't remember her last name right off the |
| 18 | top. | |
| 19 | Q. | How about Carrie's mother? |
| 20 | A. | Danielle. |
| 21 | Q. | Do you know Danielle's last name? |
| 22 | A. | Daniels. |
| 23 | Q. | And how about Chew's mom? |
| 24 | A. | Kianna Allen. |

**Page 14**

| | | |
|---|---|---|
| 1 | Q. | Do any of these three children stay or live |
| 2 | with you, ever? | |
| 3 | A. | One of them. That was Chew. |
| 4 | Q. | Chew does? |
| 5 | A. | Yes. |
| 6 | Q. | Do you have any contact at all with Natasha and |
| 7 | Carrie? | |
| 8 | A. | Not like that. |
| 9 | Q. | So the answer would be no? |
| 10 | A. | No. |
| 11 | Q. | How often do you see Chew? |
| 12 | A. | I ain't seen her since I've been locked up. |
| 13 | Q. | Before you were locked up, how often did you |
| 14 | see Chew? | |
| 15 | A. | Every day, mostly. |
| 16 | Q. | Do you know where Natasha lives now? |
| 17 | A. | No. |
| 18 | Q. | How about Carrie? |
| 19 | A. | No. |
| 20 | Q. | Do you know where Chew lives? |
| 21 | A. | She stay with my sister now. |
| 22 | Q. | At 4040 West Monroe? |
| 23 | A. | Yes. |
| 24 | Q. | Do you pay for the financial support of |

**Page 15**

| | | |
|---|---|---|
| 1 | Natasha? | |
| 2 | A. | Yes. All of them. |
| 3 | Q. | For Natasha, how much do you pay in financial |
| 4 | support? | |
| 5 | A. | I ain't been really paying nothing because I've |
| 6 | been locked up. | |
| 7 | Q. | Before you were locked up, what did you used to |
| 8 | pay in financial support of Natasha? | |
| 9 | A. | Like $650. |
| 10 | Q. | How often? |
| 11 | A. | A month. |
| 12 | Q. | Who did you give $650 a month to? |
| 13 | A. | Her mother. |
| 14 | Q. | Paris? |
| 15 | A. | Yes. |
| 16 | Q. | Before you were locked up, how much did you pay |
| 17 | for the support of Carrie? | |
| 18 | A. | I didn't pay for Carrie or Chew because I used |
| 19 | to take care of them myself. | |
| 20 | Q. | So if I understand you correctly, you did not |
| 21 | give the mothers of Carrie and Chew money because you | |
| 22 | personally assisted in taking care of them? | |
| 23 | A. | Right. |
| 24 | Q. | Well, before you were locked up, how often did |

**Page 16**

| | | |
|---|---|---|
| 1 | you used to see Carrie? | |
| 2 | A. | In a blue moon, when she bring my daughter |
| 3 | around. | |
| 4 | Q. | So when you say you personally assisted in |
| 5 | supporting Carrie, what do you mean by that? | |
| 6 | A. | I was selling drugs. |
| 7 | Q. | You were selling drugs? |
| 8 | A. | Yes. |
| 9 | Q. | When you sold drugs, obviously you made money, |
| 10 | correct? | |
| 11 | A. | Huh? |
| 12 | Q. | When you sold drugs, you made money selling |
| 13 | drugs, correct? | |
| 14 | A. | Right. |
| 15 | Q. | How did that contribute to the support of |
| 16 | Carrie? | |
| 17 | A. | I was taking care of her. When she come |
| 18 | around, she'd ask for money for the baby, and I gave it | |
| 19 | to her. | |
| 20 | Q. | How often would she come around asking for |
| 21 | money for the baby? | |
| 22 | A. | Probably every day. |
| 23 | Q. | Huh? |
| 24 | A. | Probably almost every day. |

**Page 17**

1  Q.  By the way, for Natasha, the $650 a month, did
2  you make that money by selling drugs, too?
3  A.  Yes.
4  Q.  When you say drugs, you're talking about
5  illegal drugs, correct?
6  A.  Right.
7  Q.  What did you used to sell?
8  A.  Heroin and crack.
9  Q.  Now, you said you used to contribute to the
10 support of Chew.
11     How did you used to contribute to the support
12 of Chew?
13 A.  The same thing, selling drugs.
14 Q.  Selling drugs, okay.
15     And who would you give the money -- what would
16 you do with the drug money? How did that contribute to
17 the support of Chew?
18 A.  Excuse me? What did you say? I didn't
19 understand.
20 Q.  You had sold drugs for money.
21     Did you give that money directly to Chew, or
22 how did you support Chew with that money?
23 A.  I was giving it to her mother.
24 Q.  And how often did you give her mother money?

**Page 18**

1  A.  Probably like the same amount.
2  Q.  How often would that be?
3  A.  Like every other day, just like with the other
4  ones.
5  Q.  Now, when you say you gave Carrie's mother
6  money to support the child, how much money would you give
7  Carrie's mother, and how often would you give it?
8  A.  Like every other day. Probably $100 here, $50
9  here, $60 there.
10 Q.  And when you say you gave Chew's mother money,
11 how often and how much would you give Chew's mother?
12 A.  About the same amount.
13 Q.  When you say "the same amount," the same amount
14 as Carrie?
15 A.  Yes.
16 Q.  So that would be anywhere from $50 to $100
17 every other day?
18 A.  Yes.
19 Q.  Now, you mentioned to me that you sold drugs,
20 and you say you sold heroin and crack?
21 A.  Yes.
22 Q.  Any other drugs?
23 A.  Reefer. Marijuana.
24 Q.  When you were selling drugs, were you working

**Page 19**

1  for a gang?
2  A.  Yes.
3  Q.  Which gang?
4  A.  The Black Souls.
5  Q.  Who?
6  A.  The Black Souls.
7  Q.  Where was your selling spot?
8  A.  Monroe and Pulaski.
9  Q.  How long were you selling drugs at Monroe and
10 Pulaski for?
11 A.  Since I was like 14.
12 Q.  Are you a member of the Black Souls?
13 A.  Yes.
14 Q.  Are you still a member of the Black Souls?
15 A.  No.
16 Q.  Monroe and Pulaski -- are there any other gangs
17 around there?
18 A.  Yes.
19 Q.  Which gangs?
20 A.  The Four's.
21 Q.  The Four Corner Hustlers, right?
22 A.  Yes.
23 Q.  Monroe and Pulaski -- it's pretty much the
24 borderline between the two gangs, isn't it?

**Page 20**

1  A.  Right.
2  Q.  Besides selling drugs, have you held any jobs?
3  A.  No.
4  Q.  So, no jobs at all?
5  A.  No.
6  Q.  Have you ever been in the military?
7  A.  No.
8  Q.  You said you started selling drugs when you
9  were 14 years old.
10     When was the last time you sold drugs?
11 A.  In '03.
12 Q.  2003?
13 A.  Yes.
14 Q.  And would it be fair to say that the reason you
15 stopped selling drugs was that in 2003, you were locked
16 up?
17 A.  I was constantly getting locked up.
18 Q.  You what?
19 A.  I kept getting locked up.
20 Q.  You were constantly getting locked up?
21 A.  Right.
22 Q.  And that's pretty much the reason you had to
23 stop selling drugs, correct?
24 A.  Right.

21

1  Q. Do you have a driver's license, sir?
2  A. No.
3  Q. Have you ever had a driver's license?
4  A. No.
5  Q. Well, let's talk about right now.
6     Obviously we're sitting here in the Cook County
7  Jail. What are you locked up for now?
8  A. Two aggravated car jackers, an armed robbery,
9  an aggravated robbery, two aggravated batteries, unlawful
10 use of restraints.
11 Q. How long have you been -- in terms of you being
12 locked up here today, how long have you been in custody
13 for?
14 A. Since '05.
15 Q. When you say "since '05," when were you booked
16 into the jail?
17 A. August 1st.
18 Q. Of what year?
19 A. 2005.
20 Q. And after being booked into the jail on August
21 1st of 2005, have you pretty much been in jail or in the
22 Cook County Department of Corrections since then?
23 A. Yes.
24 Q. What division are you presently living in?

22

1  A. Division IX.
2  Q. Let me direct your attention or ask you about,
3  as you put it in your complaint, September 29th of 2005.
4     So on September 29th, 2005, you were in the
5  Cook County Jail, correct?
6  A. Right.
7  Q. And you were sitting in jail for the same
8  charges that you just told me about, correct?
9  A. Right.
10 Q. Now, an incident happened on September 29th of
11 2005, correct?
12 A. Yes.
13 Q. Okay. Why don't you tell me in your own words
14 what happened?
15 A. I was housed on AG, Division XI on September
16 29th of '05 with Paul Smith.
17    The inmate, Paul Smith, took it among hisself
18 (sic) to try to sexually assault me.
19    I reported it to all the directors, the
20 Director Godinez, and I never did get a response. I put
21 in a grievance. I never get a response. And they broke
22 my jaw and my nose.
23 Q. Okay. Is there anything else you want to tell
24 me about the incident?

23

1  A. And I asked them to move me from out of the
2  cell with Paul Smith, but I constantly wrote Godinez to
3  tell him, could you all please move me from this
4  cellmate. They did never do nothing about it.
5  Q. Okay. Is there anything else you want to tell
6  me about the incident?
7  A. The director did never take action for my
8  behalf, for my safety, in protective custody.
9  Q. Is there anything else you want to tell me
10 about the incident?
11 A. No, sir.
12 Q. I'm going to go back over some of the things
13 you told me.
14    You say at the time of the incident, you were
15 housed in AG XI. What does AG mean?
16 A. That's the housing unit. That's how they go by
17 the housing unit.
18 Q. And you were in Division XI?
19 A. Yes.
20 Q. Now, you mentioned an individual by the name of
21 Paul Smith and a sexual assault. I think that was the
22 phrase you used.
23    Approximately what time of day was it that you
24 were assaulted?

24

1  A. It was like probably 3:00 in the morning.
2  Q. 3:00 a.m.?
3  A. Yes.
4  Q. Where were you?
5  A. Me and him was housed together. We was in the
6  same cell together. We were cellies.
7  Q. Was anybody else housed in that cell between
8  you and Paul Smith?
9  A. No.
10 Q. How long had you been housed with Paul Smith?
11 A. Probably like two weeks.
12 Q. Before being housed with Paul Smith for those
13 two weeks, did you ever know Paul Smith besides that, or
14 did you know the guy?
15 A. No, I did not.
16 Q. Okay. So is it fair to say that the first time
17 you met Paul Smith is when you become his cellie?
18 A. Yes.
19 Q. And for the record, when we say "cellie,"
20 that's short for cellmate?
21 A. Yes.
22 Q. During the two weeks that you were housed with
23 Paul Smith before this incident, did you have any
24 problems with him?

### Page 25

1   A.   Yes, and I kept telling Officer Nixon about the
2   incident that was going on in there. They would not move
3   me out of the cell from him.
4   Q.   So now this is during the two weeks you were
5   housed with Paul Smith?
6   A.   Yes.
7   Q.   You say you were having problems with him.
8        Specifically what problems during that two
9   weeks did you have with Paul Smith?
10  A.   He kept watching me like he wanted to do
11  something. He asked me was I a homosexual, because he's
12  a homosexual, and could we do something. I told them I
13  don't get down like that, would he leave me alone and
14  mind his business. I'm going to mind mines (sic).
15  Q.   Okay. So the problems that you had during the
16  two weeks with Paul Smith, they included that he was
17  watching you, correct?
18  A.   Yes.
19  Q.   And he was asking you about being a homosexual?
20  A.   Activities, yes.
21  Q.   And he would ask you about homosexual
22  activities?
23  A.   Yes.
24  Q.   Besides what we've just said now, were there

### Page 26

1   any other problems that you were having during the two
2   weeks with Paul Smith?
3   A.   No.
4   Q.   Now, when you say he asked you about homosexual
5   activities during the two weeks before the incident, how
6   many times did he ask about homosexual activities?
7   A.   Almost every day when I was in there.
8   Q.   And what would he say?
9   A.   He asked me would I suck on him, and I told him
10  no.
11  Q.   Besides asking you to suck on him, is there
12  anything else he said regarding homosexual activity?
13  A.   No.
14  Q.   So is it fair to say that during the two weeks
15  before the incident, almost every day he would ask you to
16  suck on him?
17  A.   Yes.
18  Q.   And in terms of him asking about homosexual
19  activity, that's all you remember him saying, correct?
20  A.   Yes.
21  Q.   And what was your response when he would ask
22  you to suck on him?
23  A.   I told him no. I tried to ask the officer to
24  move me out of the cell. They wouldn't do nothing.

### Page 27

1   Q.   During the two weeks before the incident when
2   you said you asked the officer, which officer did you
3   ask?
4   A.   Officer Nixon's on the 3:00 to 11:00 shift.
5   Q.   And you say you asked Officer Nixon this.
6        When did you ask Officer Nixon to be moved?
7   A.   As soon as he counted.
8   Q.   Huh?
9   A.   As soon as he counted. They have to count.
10  Q.   How often did you ask Officer Nixon to be
11  moved?
12  A.   Almost every day.
13  Q.   And this is before the incident?
14  A.   Yes.
15  Q.   And the time you would ask him is after he
16  counted?
17  A.   During the time he counted.
18  Q.   During the time he counted?
19  A.   Yes.
20  Q.   How often during the two weeks prior to the
21  incident did Officer Nixon work?
22  A.   Like five days a week.
23  Q.   Do you know Officer Nixon's first name?
24  A.   No, I do not.

### Page 28

1   Q.   Can you describe what he looks like?
2   A.   Tall, black, low haircut, glasses. Like a
3   crewcut.
4   Q.   Do you know his badge number?
5   A.   No, I do not.
6   Q.   And what would you tell Officer Nixon?
7   A.   I told him that Paul Smith is constantly trying
8   to sexually assault me. He want to have sex with me and
9   do all types of other things that I don't want to do with
10  him. Would you please move me out of the cell from him.
11  And he told me, no.
12  Q.   Besides everything that you've -- well, let me
13  ask you this. I'll rephrase the question.
14       In terms of what you told Officer Nixon,
15  besides everything you've told me that you used to tell
16  him already, is there anything else you told
17  Officer Nixon?
18  A.   No.
19  Q.   And every time that you would ask this, is it
20  fair to say that Officer Nixon would just say no?
21  A.   Yes.
22  Q.   Is there anything else he said?
23  A.   No, sir.
24  Q.   During the two weeks prior to the incident, is

## Page 29

1 there anybody else that you told about what was going on
2 with Paul Smith, besides Officer Nixon?
3     A.    **Yes. I was writing the director, Godinez. I**
4 **never get a response. I sent 10, 20 letters and never**
5 **get a response from him.**
6     Q.    You said you wrote Officer Godinez 20 letters?
7     A.    **10 to 20 letters.**
8     Q.    10 to 20. And this is the two weeks before the
9 incident?
10     A.    **During the incident.**
11     Q.    Okay. Let's break this down a little bit.
12     Timewise now -- and correct me if I'm wrong --
13 you said you lived with Paul Smith for about two weeks
14 until this sexual assault, correct?
15     A.    **Right.**
16     Q.    Before the two weeks, you didn't know
17 Paul Smith?
18     A.    **No.**
19     Q.    Is it fair to say that before the two weeks,
20 you had never seen Paul Smith in your life?
21     A.    **Going to court, yes, back and forth, but I**
22 **never said nothing to him because we never be together.**
23     Q.    So the first time you've ever had real contact
24 with Paul Smith was during the two weeks that you were

## Page 30

1 his cellmate, correct?
2     A.    **Yes.**
3     Q.    And then after the two weeks of being with him
4 there was a sexual assault, correct?
5     A.    **Yes.**
6     Q.    You have also told me that during the two
7 weeks, you spoke, or had conversations with Officer Nixon
8 about Paul Smith, correct?
9     A.    **Yes.**
10     Q.    Simply talking about that two-week period,
11 besides Officer Nixon, is there anybody else that you
12 told about what was going on with you and Paul Smith?
13     A.    **Director Godinez.**
14     Q.    Okay. How did you tell Director Godinez of the
15 Cook County Jail what was going on between you and
16 Paul Smith during that two-week period?
17     A.    **I wrote him letters, but--**
18     Q.    How many letters, during the two-week period,
19 did you write Officer Godinez?
20     A.    **About 10 to 20 letters.**
21     Q.    So you're saying during the two-week period
22 that you're having trouble with Paul Smith, you wrote 10
23 to 20 letters to Officer Godinez in a two-week period?
24     A.    **Yes.**

## Page 31

1     Q.    You addressed those letters to Officer Godinez?
2     A.    **Yes.**
3     Q.    What address did you send those letters to?
4     A.    **They was in like a grievance thing, like the**
5 **grievance forms they give you.**
6     Q.    So you wrote those letters on a grievance form?
7     A.    **Yes.**
8     Q.    And that's the same for each of the 10 to 20
9 letters?
10     A.    **Yes.**
11     Q.    What did you do with these grievance forms
12 after you wrote them?
13     A.    **I gave them to the sergeants and the**
14 **lieutenants. They come through there, on the desk.**
15     Q.    Do you know the names of any of the sergeants
16 or the lieutenants that you gave these grievance letters
17 to?
18     A.    **Lieutenant Johnson. It was Sergeant Johnson at**
19 **first, and now he's a lieutenant in Division V.**
20     Q.    Do you know Sergeant or Lieutenant Johnson's
21 first name?
22     A.    **No, I do not.**
23     Q.    Do you know the names of any of the other, any
24 of the other people that you gave these 10 to 20 letters

## Page 32

1 to?
2     A.    **No. I don't remember the sergeant's name.**
3     Q.    And these letters, do you have copies of these
4 letters that you wrote?
5     A.    **I ain't never got a response back.**
6     Q.    My question is, do you have any copies of these
7 letters that you wrote?
8     A.    **No.**
9     Q.    Would it be fair to say that if I were to sit
10 there -- well, let me ask it this way.
11     What did you say in these letters?
12     A.    **Same thing I mostly said in my lawsuit papers.**
13     Q.    In your what?
14     A.    **In my papers, in my lawsuit papers.**
15     Q.    But specifically, what did you say in the
16 letters?
17     A.    **I told him that Paul Smith constantly**
18 **attempting -- trying to have sex with me, and he tried to**
19 **rape me, and I want to be moved out of the cell.**
20     Q.    Is there anything else that you remember saying
21 in these letters?
22     A.    **No.**
23     Q.    And just so we're clear, you don't have any
24 copies of any of these letters, correct?

**33**

1  A. No.
2  Q. Well, let me rephrase the question.
3     Do you have copies of any of these letters?
4  A. No.
5  Q. Besides these letters and speaking to
6  Officer Nixon, is there anybody else that you told during
7  this two-week period about what was going on between you
8  and Paul Smith?
9  A. No.
10 Q. Do you have any knowledge or any information
11 that Mr. Godinez ever received these letters?
12 A. No, I do not.
13 Q. So it's fair to say that -- would it be fair to
14 say that you don't know whether Officer Godinez received
15 these letters?
16 A. No, I do not.
17 Q. Do you have any information whatsoever that
18 Officer Godinez was in any way trying to punish you or
19 had anything against you personally?
20 A. No.
21 Q. Do you have any information that
22 Officer Godinez was trying to implement a policy at the
23 jail that was intended or geared toward punishing you?
24 A. No.

**34**

1  Q. Do you remember the dates for which you wrote
2  any of these letters?
3  A. The one was October the 4th, 2005.
4  Q. That was after the incident, correct?
5  A. Yes.
6  Q. Do you have the dates for any letters that you
7  wrote to Officer Godinez from before the incident?
8  A. No.
9  Q. So in terms of letters that you wrote to
10 Officer Godinez before the incident, you wouldn't be able
11 to tell me the dates you wrote any of those letters,
12 correct?
13 A. No.
14 Q. And before the incident, how many letters would
15 you have written?
16 A. Probably about 10 to 20 letters.
17 Q. For the letters that you wrote during the two
18 weeks before the incident, are there any other witnesses
19 to you writing those letters?
20 A. Yes. The inmates.
21 Q. And when you say "witnesses" to you writing the
22 letters, are these people that actually saw you writing
23 letters?
24 A. Yes. There's one inmate who specifically

**35**

1  helped me write the letter.
2  Q. And who is that inmate?
3  A. Andre Crawford.
4  Q. How do you know Andre Crawford?
5  A. He was on deck with me when it happened.
6  Q. Did Andre Crawford assist in writing the
7  letters during the two weeks before the incident?
8  A. Excuse me?
9  Q. Did Andre Crawford assist you in writing any of
10 letters that were written before the incident?
11 A. Yes.
12 Q. How many letters did Andre Crawford assist you
13 in writing?
14 A. Like one.
15 Q. One?
16 A. Yes.
17 Q. Besides the letter that Andre Crawford assisted
18 you in writing, are there any other witnesses to you
19 writing these letters?
20 A. I don't know his last name. His name is Bobby.
21 He's on 3-E.
22 Q. Bobby?
23 A. Yes, but I don't know his last name.
24 Q. And how is he a witness to you writing these

**36**

1  letters?
2  A. He was there when everything happened, and he
3  was there in the dayroom. We was writing the letters.
4  Q. Okay. So did Bobby assist you in writing a
5  letter?
6  A. No.
7  Q. Just in terms of the information you have, as
8  far as you know, Bobby saw you writing a letter?
9  A. Yes.
10 Q. How many letters did Bobby see you write?
11 A. Probably like three.
12 Q. Three?
13 A. Yes.
14 Q. The one letter that Andre Crawford helped you
15 write, was that letter written before or after the
16 incident?
17 A. It was after the incident.
18 Q. And that's the only letter that Andre Crawford
19 assisted or witnessed for you, correct?
20 A. Yes.
21 Q. The letters that Bobby from 3-E saw you write,
22 were those letters written before or after the incident?
23 A. It's after.
24 Q. After the incident?

37

1   A.  Yes.
2   Q.  Are there any witnesses to any letters written
3 before the incident?
4   A.  No, that I know of.
5   Q.  Besides Andre Crawford and Bobby from 3-E, do
6 you know the names of anybody else that have knowledge of
7 these letters, regardless of whether or not they saw you
8 write them?
9   A.  Officer Nixon.
10  Q.  Okay. Anybody else?
11  A.  That's it.
12  Q.  Besides the letters that you say you wrote to
13 Officer Godinez, do you have any knowledge of any other
14 way Officer Godinez would have known what was going on
15 between you and Paul Smith?
16  A.  Excuse me? Repeat your question.
17  Q.  Sure. Besides the letters that you say you
18 wrote to Officer Godinez, is there any other way that you
19 would know of that Godinez would have been aware of what
20 was going on between you and Paul Smith?
21  A.  No.
22  Q.  So the letters would have been the only way
23 Officer Godinez would have been aware of what was going
24 on?

38

1   A.  Right.
2   Q.  Now, you said the incident happened about 3:00
3 in the morning?
4   A.  Yes.
5   Q.  Why don't you tell me what happened at 3:00 in
6 the morning?
7   A.  At 3:00 in the morning, me and Paul Smith was
8 housed and Paul Smith wrapped a sheet around my face. He
9 attempted to try to pull my pants down. He said I'm
10 going to have sex with him, or I'm going to die in the
11 cell with him.
12  Q.  How tall is Paul Smith?
13  A.  He's probably about five-eight, five-nine.
14  Q.  How much does he weigh?
15  A.  I don't even know.
16  Q.  Approximately?
17  A.  Probably like 215.
18  Q.  He's five-eight and 215 pounds?
19  A.  Yes.
20  Q.  So he's a pretty fat guy?
21  A.  No. Muscular.
22  Q.  Okay. What color is he?
23  A.  He's black.
24  Q.  Do you know if he's a member of any gang?

39

1   A.  He was a GD.
2   Q.  Was there anybody else in the cell when this
3 was going on?
4   A.  Two other dudes, but I didn't know them.
5   Q.  So there are two other guys in the cell while
6 the assault was going on?
7   A.  Yes. They was trying to help him pull my pants
8 down.
9   Q.  Help him?
10  A.  Yes. That's how my jaw and my nose got broke.
11  Q.  So there was four of you to a cell?
12  A.  Yes. No, there wasn't. He let them in. You
13 know, they put the screen through the cell and pop the
14 lock in the cell.
15  Q.  Do you know the names of these other guys?
16  A.  No, I do not.
17  Q.  Can you describe what the other guys looked
18 like?
19  A.  One was long hair and little stocky,
20 brown-skinned dude. The other one was a big, black,
21 bald-headed dude.
22  Q.  The long-haired, stocky dude, as you called
23 him, when you say brown -- he's a black guy with light
24 skin?

40

1   A.  Black, yes.
2   Q.  Anything else you remember about that guy, the
3 way he looked?
4   A.  No.
5   Q.  The big guy, besides him being big, do you
6 remember anything else about the way he looked?
7   A.  He was like bald-headed with facial hair.
8   Q.  Anything else you remember about the way he
9 looked?
10  A.  He had a scar on his face right here
11 (indicating).
12      MR. DeBENEDETTO: Indicating for the record--
13      THE WITNESS: His right side of his face.
14      MR. DeBENEDETTO: --that Mr. Newby touched the
15 right side of his face and indicated a scar of about an
16 inch and a half.
17      MR. DeBENEDETTO: Q. Anything else you remember
18 about the way the big, bald-headed guy looked?
19  A.  No.
20  Q.  What were you doing immediately before the
21 assault?
22  A.  I was trying to fight my way off of them,
23 but...
24  Q.  Well, let me back you up then.

41

1  Q. What is the first thing you remember about the
2  assault?
3  A. I was asleep.
4  Q. And what's the first thing you remember about
5  it?
6  A. When I was asleep, they put a sheet or
7  something over my face, but when I pulled it off, they
8  was the only people I seen in the cell, and they just
9  kept punching me and punching me.
10     And the one grabbed me in a full nelson, trying
11 to pull my pants down.
12 Q. Who did?
13 A. The big bald-headed dude.
14 Q. What's his name?
15 A. I don't know.
16 Q. Oh, full nelson, you were saying?
17 A. Yes.
18 Q. So the first thing you remember is a sheet put
19 on you. When they put the sheet on you, were you able to
20 see?
21 A. No, not at first.
22 Q. So where did they put the sheet over your head?
23 A. Over my face, and pulled me out of the bed.
24 Q. How long were you not able to see for?

42

1  A. For probably like two, three minutes.
2  Q. What do you remember going on during the two,
3  three minutes?
4  A. That I was getting punched in the face.
5  Q. Obviously you couldn't see who was punching you
6  in the face?
7  A. No, I could not.
8  Q. What's the next thing you remember happening?
9  A. I pulled the sheet off my face and I seen all
10 three of them in the cell, and they just kept punching
11 me.
12 Q. Did Paul Smith punch you?
13 A. Yes.
14 Q. And the other two guys punched you, too?
15 A. Yes.
16 Q. Where did Paul Smith punch you?
17 A. In my face.
18 Q. Anywhere else?
19 A. No.
20 Q. How about the dark-skinned -- excuse me.
21    How about the lighter-colored black guy? Where
22 did he punch you?
23 A. He just kept hitting me right in my -- like
24 right up in here, in my jaw and my nose.

43

1  Q. And did he punch you anywhere else?
2  A. No.
3  Q. How about the big, bald guy? Where did he
4  punch you?
5  A. He punched me a couple of times, but he put me
6  in a full nelson. That's how they was trying to pull my
7  pants down.
8  Q. Where did the bald guy punch you on your body?
9  A. In my face.
10 Q. Anywhere else?
11 A. No.
12 Q. How many times did Paul Smith punch you?
13 A. Probably a good 15, 20 times.
14 Q. How about the light-skinned black guy, how many
15 times did he punch you?
16 A. Probably about the same amount.
17 Q. 15 to 20 times in the face?
18 A. Yes.
19 Q. How about the bald guy? How many times did he
20 punch you?
21 A. Probably like two or three. That's when he
22 grabbed me in a full nelson.
23 Q. Let me ask you, the lighter-skinned dark guy,
24 how tall was he about?

44

1  A. Probably like five-eight, five-nine.
2  Q. How heavy was he?
3  A. Excuse me?
4  Q. How heavy was he? How much did he weigh?
5  A. I don't know. Probably like 180, 190.
6  Q. The big, bald guy, about how tall was he?
7  A. He's probably my height, like six-four.
8  Q. And what did he weigh?
9  A. Probably like 150 or something.
10 Q. You mentioned yourself. How tall are you?
11 A. Six-four.
12 Q. How much did you weigh?
13 A. I weigh 180.
14 Q. 180?
15 A. Yes.
16 Q. For how long were you being punched before they
17 tried to pull your pants down?
18 A. For probably like a good five minutes.
19 Q. Five minutes?
20 A. Yes.
21 Q. Were they saying anything to you while they
22 were punching you?
23 A. They said they going to -- I'm going to get it
24 in my ass or I'm going to die in the cell.

**Page 45**

1  Q. Who said that to you?
2  A. **All of them was saying the same thing.**
3  Q. All of them were saying that?
4  A. **Yes.**
5  Q. Is there anything you remember -- all right.
6     So when say all of them were saying that,
7  Paul Smith was saying that?
8  A. **Yes.**
9  Q. The light-skinned guy was saying that?
10 A. **Yes.**
11 Q. And the big, bald guy was saying that?
12 A. **Yes.**
13 Q. How many times did Paul Smith say that?
14 A. **I don't remember because I kept getting**
15 **punched.**
16 Q. Do you remember how many times the
17 light-skinned guy said it?
18 A. **No.**
19 Q. How about the big, bald guy? Do you remember
20 how many times he said it?
21 A. **No.**
22 Q. Is there anything else you remember him saying
23 besides what you just told me?
24 A. **No. I blanked out. They kept hitting me.**

**Page 46**

1  Q. Now, who tried to pull your pants off?
2  A. **I don't remember.**
3  Q. Now, you said a full nelson.
4     Was it the big, bald guy that put you in a full
5  nelson?
6  A. **Yes. That's how I remember.**
7  Q. Do you remember anything else about the assault
8  after the big, bald guy tried to put you into a full
9  nelson?
10 A. **No.**
11 Q. What's the next thing you remember then?
12 A. **I blanked out, and when I woke up, I was in**
13 **Cermak.**
14 Q. So is it fair to say that from the time the
15 big, bald guy put you into a full nelson until the time
16 that you were in Cermak, you don't remember anything else
17 in between those two times?
18 A. **No.**
19 Q. That's fair to say? Let me rephrase the
20 question.
21    From the time you were put into a full nelson
22 until you ended up at Cermak, do you remember anything
23 else between those two times?
24 A. **No.**

**Page 47**

1  Q. Were you ever sexually assaulted?
2  A. **No.**
3  Q. So as far as you know, you were never
4  penetrated or anything like that?
5  A. **That I know of. They said no. The doctor said**
6  **no.**
7  Q. Do you have any knowledge that you were
8  penetrated?
9  A. **No.**
10 Q. Do you have any knowledge as to how this
11 assault was broken up, or stopped, or anything like that?
12 A. **No.**
13    MR. DeBENEDETTO: One second.
14    (Brief pause.)
15 MR. DeBENEDETTO: Q. Do you remember what time you
16 woke up at Cermak Hospital?
17 A. **No. I don't remember.**
18 Q. Let me ask you this.
19    When you said Officer Nixon, do you know an
20 Officer Nickerson?
21 A. **Yes.**
22 Q. Is that the Officer Nixon we're talking about?
23 A. **Yes.**
24 Q. And according to you -- let me ask you one more

**Page 48**

1  time.
2     From the time that you were put into a full
3  nelson by the big guy, the big, bald black guy, until the
4  time you ended up at Cermak Hospital, do you remember
5  anything that happened in between those two times?
6  A. **No.**
7  Q. After the incident, who did you tell, or who
8  did you talk to about the incident after it happened?
9  A. **The sergeant.**
10 Q. Sergeant who?
11 A. **Johnson.**
12 Q. Johnson?
13 A. **Yes.**
14 Q. When did you tell him or talk to him about the
15 incident?
16 A. **On the 3:00 to 11:00 shift, and the captain.**
17 Q. And what's the captain's name?
18 A. **I don't remember.**
19 Q. Did you talk to Officer Nixon about what
20 happened, after it happened?
21 A. **Yes.**
22 Q. And by the way, when we say Officer Nixon, is
23 it possible that that could be Officer Nickerson?
24 A. **Yes. The tall, black dude, we used to call him**

**Page 49**

1 Nixon.
2  Q.  Okay. How soon after the incident did you
3 speak to Officer Nickerson about the incident?
4  A.  It was like a couple of days afterwards.
5  Q.  Couple of days afterward?
6  A.  Yes.
7  Q.  That was the first time you spoke to
8 Officer Nixon about it?
9  A.  No.
10  Q.  After the incident, when was the first time you
11 spoke to Officer Nixon about the incident?
12  A.  You say after the incident?
13  Q.  Yes.
14  A.  A couple of days after.
15  Q.  Okay. Between the time of the incident and a
16 couple of days afterwards, are there any other times that
17 you spoke to Officer Nixon about the incident?
18  A.  No.
19  Q.  About what time of day was it that you spoke to
20 Officer Nixon about the incident?
21  A.  It was around probably like 5:00, right after
22 the trays, the dinner trays.
23  Q.  And what did you tell Officer Nixon?
24  A.  He asked me what happened, and I explained

**Page 50**

1 everything what happened.
2  Q.  What did you tell him happened?
3  A.  That Paul Smith and two other guys that was in
4 the cell, that he let them in the cell, they tried to
5 rape me. They kept punching me, and I passed out.
6  Q.  Is there anything else you told him about the
7 incident?
8  A.  Not that I know of, no.
9  Q.  Now, you said you spoke to Sergeant Johnson
10 about the incident?
11  A.  Yes.
12  Q.  How soon after the incident did you speak to
13 him about it?
14  A.  He came right upstairs after the incident
15 happened. They say he was looking for me, but I was in
16 Cermak.
17  Q.  Okay. So, did you ever speak to Lieutenant or
18 Sergeant Johnson after the incident?
19  A.  After a couple of days.
20  Q.  After a couple of days?
21  A.  Yes.
22  Q.  Where did you speak to Officer Johnson at?
23  A.  In the multi-purpose room.
24  Q.  How long did that conversation last?

**Page 51**

1  A.  Like 15 minutes.
2  Q.  Anybody else present for that conversation?
3  A.  A captain. I don't remember his name though.
4  Q.  And what did you tell him happened?
5  A.  I told him the same thing I told Officer Nixon.
6  Q.  What did you say to Sergeant Johnson?
7  A.  I told Sergeant Johnson that Paul Smith and two
8 other guys tried to rape me, and they kept punching me
9 and I blanked out.
10  Q.  Besides Officer Nixon, or Nickerson, and
11 Captain Johnson -- or excuse me -- Lieutenant Johnson or
12 Sergeant Johnson, is there anybody else that you told
13 about the incident?
14  A.  No.
15  Q.  So those two individuals are the only two
16 individuals that you spoke to about the incident after it
17 happened?
18  A.  And the captain.
19  Q.  What's the captain's name?
20  A.  I don't know. I don't remember his name. I
21 know he was white, tall. He had a little box, like
22 medium-size hair.
23  Q.  Let me ask you this.
24  When you spoke to Officer Nixon about the

**Page 52**

1 incident, you indicated that happened a couple of days
2 after the incident?
3  A.  Yes.
4  Q.  Where did that conversation take place?
5  A.  It was in right on the deck, right in the
6 triage.
7  Q.  What time of day was it?
8  A.  It was probably like 5:00, 5:30.
9  Q.  Anybody else present for that conversation?
10  A.  No.
11  Q.  When you spoke to Lieutenant or
12 Sergeant Johnson, when did that conversation occur?
13  A.  In the multi-purpose room.
14  Q.  Which conversation happened first, the one you
15 had with Nixon or the one you had with Johnson?
16  A.  Nixon.
17  Q.  How much time passed between when you told
18 Nixon about the incident to when you told Johnson about
19 the incident?
20  A.  Johnson came up later on that day.
21  Q.  About what time of day did you speak to
22 Lieutenant Johnson about it?
23  A.  About 8:00 o'clock, 9:00.
24  Q.  P.M.?

### Page 53

1  A. Yes.
2  Q. And you indicated that there was -- who else
3  was present for that conversation with Johnson?
4  A. The captain.
5  Q. And you don't remember his name?
6  A. No, I do not.
7  Q. Now, besides these two individuals, you said
8  there's another individual you spoke to about the
9  incident, or not?
10 A. No.
11 Q. Okay. So the captain -- and correct me if I'm
12 wrong. Let me ask you this.
13         Besides the captain, whose last name you don't
14 know, Nixon and Johnson, is there anybody else that you
15 spoke to about this incident?
16 A. No.
17 Q. After the incident happened, did you speak to
18 Mr. Godinez about the incident?
19 A. No.
20 Q. Did you write any letters to Mr. Godinez about
21 the incident?
22 A. I wrote one grievance.
23 Q. One grievance?
24 A. Yes.

### Page 54

1  Q. About the incident?
2  A. Yes.
3  Q. Did you write any other letters besides that
4  grievance about the incident?
5  A. Say it once more. Excuse me?
6  Q. Besides that grievance, did you write any other
7  grievance or letters about the incident?
8  A. No.
9  Q. So just the one grievance?
10 A. Yes.
11 Q. Do you have a copy of that grievance?
12 A. No.
13 Q. Do you remember the date you wrote that
14 grievance?
15 A. No.
16 Q. Do you remember what you said in that
17 grievance?
18 A. Not really, because I filed the grievance out,
19 and then they sent me to the joint the next day. So I
20 ain't never got a response.
21 Q. How soon after the incident did you write that
22 grievance?
23 A. Probably like two days after. I spoke to
24 Lieutenant Johnson, because they told me to fill out a

### Page 55

1  grievance and turn it in.
2  Q. So Lieutenant Johnson told you to fill out a
3  grievance?
4  A. Yes.
5  Q. How soon after filling out the grievance did
6  you -- you said you got sent to the joint. Let me back
7  up.
8          By "the joint," you mean the Illinois
9  Department of Corrections, correct?
10 A. Yes.
11 Q. How soon after filling out the grievance did
12 you get sent to the Illinois Department of Corrections?
13 A. The next day.
14 Q. So it's fair to say about what, three days
15 after the incident then?
16 A. Yes.
17 Q. Now, let me back you up a little bit.
18         You said before the incident during the two
19 weeks that you lived with Mr. Smith, you wrote about 10
20 to 20 letters to Mr. Godinez, correct?
21 A. Yes.
22 Q. There are seven days in a week, correct?
23 A. Yes.
24 Q. So two weeks is 14 days, correct?

### Page 56

1  A. Right.
2  Q. Is there ever a day that you wrote more than
3  one letter to Officer Godinez about what was going on
4  between you and Paul Smith?
5  A. No.
6  Q. Okay. So during those two weeks, there was
7  never a day -- let me ask you the question this way.
8          During that two-week period, was there any day
9  in that two-week period -- a day being 24 hours -- that
10 you wrote more than one letter to Officer Godinez?
11 A. No.
12 Q. What's your answer?
13 A. No.
14 Q. Was there ever a day during that two-week
15 period where you didn't write a letter to
16 Officer Godinez?
17 A. No.
18 Q. Excuse me?
19 A. Yes. Yes.
20 Q. So there were days during that two-week period
21 before the incident that you didn't write a letter to
22 Godinez?
23 A. Right.
24 Q. How many days like that were there?

**57**

1  A.  Probably like three times out of a week.
2  Three, four times out of a week.
3  Q.  So three or four times out of a week, for that
4  two-week period, were days where you wrote nothing to
5  Officer Godinez, correct?
6  A.  Right.
7  Q.  Now, after the incident, when you wrote the one
8  grievance that you told me about, how soon after writing
9  that grievance did you get moved to the joint, as you put
10 it?
11 A.  The next day.
12 Q.  The next day?
13 A.  Yes.
14 Q.  How long did you remain at the Illinois
15 Department of Corrections?
16 A.  I don't even remember.
17 Q.  Okay.
18 A.  They kept sending me back and forth, back and
19 forth, back and forth.  That's why I probably never heard
20 a response from him.
21 Q.  So as far as your understanding goes, it's fair
22 to say that one reason why you didn't hear a response is
23 because you spent a lot of time going back and forth
24 between the Illinois Department of Corrections and Cook

**58**

1  County, correct?
2  A.  Right.
3  Q.  Do you have any evidence that Officer Godinez
4  was trying to stop your grievance from going through or
5  frustrating your grievance?
6  A.  No.
7  Q.  Do you have any evidence that Officer Godinez
8  even -- Officer Godinez we're talking about -- even knew
9  that you wrote a grievance?
10 A.  Yes.
11 Q.  How do you know that Officer Godinez knew that
12 you wrote a grievance?
13 A.  No, he don't know.  He didn't ever know.
14 Q.  He never knew?
15 A.  No.
16 Q.  Do you have any information or any evidence
17 that Officer Godinez implemented a policy to ignore your
18 grievance?
19 A.  No.
20 Q.  Now, let me ask you about some other things.
21     In terms of any injuries suffered as a result
22 of the incident, were you injured because of the
23 incident?
24 A.  Yes.

**59**

1  Q.  What injuries did you sustain as a result of
2  the incident?
3  A.  A broken jaw and a fractured nose.
4  Q.  How do you know that your jaw was broken?
5  A.  Because when I went to Cermak, they gave me
6  x-rays, and they said they had to send me to an outside
7  hospital.  They said I got my jaw broken in eight places
8  on both sides of my face.
9  Q.  Who took the x-rays, Cermak or the outside
10 hospital?
11 A.  Cermak did first.
12 Q.  And then they sent you to an outside hospital?
13 A.  Yes.
14 Q.  Which was the outside hospital?  Stroger?
15 A.  Yes.
16 Q.  Which x-rays showed that your jaw was broken in
17 eight places?
18 A.  I don't know.
19 Q.  Besides your jaw being broken in eight places,
20 do you have any knowledge of any other injury that you
21 sustained as a result of the incident?
22 A.  No.
23 Q.  So just your jaw being broken in eight places,
24 that was your injury as a result of the incident?

**60**

1  A.  Right.
2  Q.  How long did you remain at Cermak for after the
3  incident?
4  A.  Probably a few hours.
5  Q.  Couple of hours?
6  A.  Yes.
7  Q.  And where did you go after a couple of hours?
8  A.  They sent me back to my tier.
9  Q.  So you remained at Cermak for a couple of
10 hours, and then Cermak sent you back to your tier?
11 A.  Yes.
12 Q.  Did they send you back with your jaw broken in
13 eight places?
14 A.  Yes.
15 Q.  How much time passed from the incident until
16 you were discharged to Illinois Department of
17 Corrections?  How much time period was there?
18 A.  Probably like a good six months.
19 Q.  Six months?
20 A.  Yes.
21 Q.  So from the date of the incident until you went
22 to the Illinois Department of Corrections, there was a
23 six-month gap?
24 A.  Yes, because they kept sending me back and

## Page 61

1  forth, back and forth, back and forth. I was here, then
2  I was there. Here, there.
3      Q.  Okay. Let me ask you this.
4          You indicated that a couple of days, or excuse
5  me, the day after you wrote the grievance, you went to
6  the Illinois Department of Corrections, right?
7      A.  Yes.
8      Q.  Between that trip to the Illinois Department of
9  Corrections and the incident itself, how much time period
10 was that between the incident and the first time you went
11 to the Illinois Department of Corrections?
12     A.  Probably like a day. A day after.
13     Q.  So from the date of the incident until you
14 first went to the Illinois Department of Corrections, was
15 that about a day time period?
16     A.  It's like a couple of days after.
17     Q.  So a couple of days after the incident is when
18 you first went to the Illinois Department of Corrections?
19     A.  Yes.
20     Q.  So from the day of the incident until you first
21 went a couple of days later to the Illinois Department of
22 Corrections, you went to Cermak, correct?
23     A.  Yes.
24     Q.  And you stayed a couple of hours at Cermak,

## Page 62

1  correct?
2      A.  Yes. A few hours.
3      Q.  During that period, between the incident and a
4  couple of days later when you went off to the Illinois
5  Department of Corrections the first time, besides Cermak,
6  were there any other hospitals you went to during that
7  time period?
8      A.  They scheduled me to go to an outside hospital,
9  but they sent me to the joint.
10     Q.  So you never got to the outside hospital?
11     A.  Until after I came back.
12     Q.  Okay. But what I'm saying is, during the
13 couple of days between the incident and when you first
14 got shipped to the Illinois Department of Corrections,
15 the only hospital you saw was Cermak, correct?
16     A.  Right.
17     Q.  How long were you at the Illinois Department of
18 Corrections before you came back to Cook County Jail?
19     A.  I don't remember. From September I think to
20 December the 5th or something. Something like that.
21     Q.  So from September to December of 2005?
22     A.  Yes.
23     Q.  During that time period, did you go to any
24 other hospitals during September to December of 2005?

## Page 63

1      A.  No.
2      Q.  Okay. So from the date of the incident, it
3  being September of '05, until December of '05, during
4  that time period, the only hospital you went to was
5  Cermak Hospital?
6      A.  Yes.
7      Q.  And that was -- your stay at Cermak Hospital
8  that you made during that time period was for a couple of
9  hours, correct?
10     A.  For x-rays.
11     Q.  For x-rays?
12     A.  Yes.
13     Q.  And no other hospitals were seen from September
14 until December of 2005?
15     A.  Right.
16     Q.  Correct?
17     A.  Right.
18     Q.  Now, sir, just looking at your medical chart,
19 are you aware of a nurse's assessment done on September
20 30th of 2005, recording a small amount of swelling to
21 your left face with superficial scratches?
22     A.  Yes.
23     Q.  And basically the treatment that they gave you
24 was Tylenol and a cold pack to put on your face, correct?

## Page 64

1      A.  Yes.
2      Q.  Now, you indicated they gave you x-rays at
3  Cermak Hospital during that time period between September
4  and December of '05, correct?
5      A.  Yes.
6      Q.  And according to you, these x-rays showed that
7  your mouth was fractured in eight spots?
8      A.  Yes.
9      Q.  So are you aware of any x-ray from, say, Cermak
10 Health Services, an x-ray result which records a finding
11 of multiple views of orbits obtained?
12         "They show no evidence of fracture. The orbits
13 and walls of the antra or bony structures demonstrated --
14 appear to be in intact."
15         Do you have any awareness of an x-ray result
16 like that?
17     A.  No.
18     Q.  Have you ever read any of the x-ray results
19 that were done at Cermak Hospital when you went there
20 after the incident?
21     A.  No. They don't give you that type of
22 information.
23     Q.  So when you say your mouth was broken in eight
24 spots, what are you basing that on?

**65**

1   A.  My bone. They say they had to cut my face on
2  each side from here to here, because they said there was
3  a bone on the inside of my face.
4       They said if I get punched in my face the right
5  way, they'll punch my brain and kill me. That's why I'm
6  in protective custody. That's why I never signed out to
7  go back to the population.
8   Q.  Okay. You're saying that jaw problem was
9  because of what happened to you in the incident?
10  A.  Right.
11  Q.  When you were admitted to the -- let me ask you
12  this.
13      Are you familiar with TMJ?
14  A.  Yes.
15  Q.  When you were admitted to the jail, you had
16  TMJ, correct?
17  A.  Yes.
18  Q.  TMJ is a serious jaw -- it's a serious problem
19  with the structure of your jaw, correct?
20  A.  Right.
21  Q.  You had that upon admission to the jail,
22  correct?
23  A.  That I know of, yes.
24  Q.  And when you were admitted to the jail, you had

**66**

1  that serious jaw problem, and that was before the
2  incident even occurred, correct?
3   A.  Right.
4   Q.  And when you were admitted to the jail with
5  that TMJ -- let me put it this way.
6       Before you were admitted to the jail, you had
7  seen doctors about the TMJ problem, correct?
8   A.  Right.
9   Q.  And before you were admitted to the jail,
10  repeatedly doctors had advised you about the need for you
11  to have surgery on your mouth, correct?
12  A.  Right.
13  Q.  In fact, there were even several occasions
14  where you refused to have the surgery, correct?
15  A.  Right.
16  Q.  And that was before you were even admitted the
17  jail, correct?
18  A.  Right.
19  Q.  And all that was before this incident, correct?
20  A.  Yes.
21  Q.  Let me ask you this.
22      In looking at your Cermak health records, back
23  in 2003 you received an x-ray for your jaw, correct?
24  A.  Yes.

**67**

1   Q.  And even back as far as 2003, those x-rays were
2  showing that your jaw was dislocated, correct?
3   A.  Yes.
4   Q.  And in fact, these were x-rays that were taken
5  both at Cermak Hospital and John Stroger Hospital,
6  correct?
7   A.  Yes.
8   Q.  And in fact, as far back as November of 2003,
9  they were recommending back then that you have surgery on
10  your jaw, correct?
11  A.  Yes.
12  Q.  And in fact, it was back then that you refused
13  to have the surgery on your jaw, right?
14  A.  Yes.
15  Q.  Now, you brought a lawsuit against Mr. Godinez.
16      Paul Smith -- have you ever attempted to bring
17  a lawsuit against him?
18  A.  Yes, but...
19  Q.  You have?
20  A.  Yes.
21  Q.  You filed a lawsuit against Paul Smith?
22  A.  No, not yet.
23  Q.  How soon after the incident did you file this
24  lawsuit?

**68**

1   A.  That was after they brought me back in the
2  joint last year.
3   Q.  How much time passed between the incident and
4  when you filed this lawsuit?
5   A.  Probably like six months.
6   Q.  Six months?
7   A.  Yes, after I came back, because I didn't know
8  how to fill out the paperwork. That's why they got me
9  going pro se.
10  Q.  And this happened in September of 2005,
11  correct?
12  A.  Yes.
13  Q.  Now, we're in May of 2008.
14      You haven't filed a lawsuit against Paul Smith,
15  correct?
16  A.  No.
17  Q.  When were you intending on filing a lawsuit
18  against Paul Smith?
19  A.  I was trying to find out what was going to
20  happen to this, this lawsuit right here.
21  Q.  Is there any reason that the first person you
22  sued was Mr. Godinez, rather than the first person being
23  sued being the actual guy that did this to you?
24  A.  Because he didn't never respond to my grievance

**Page 69**

1    when I wrote to him.
2      Q.  When you say the grievance, are you talking
3    about that one grievance you wrote after the incident?
4      A.  Yes.
5      Q.  And who didn't respond to it?
6      A.  Director Godinez didn't respond to it.
7      Q.  And this is the grievance you wrote like the
8    day before you were discharged, correct?
9      A.  Right.
10     Q.  And that's the reason you're suing the director
11   of the Cook County Jail as opposed to the guy that
12   actually did this to you?
13     A.  Yes.
14     Q.  So would it be your testimony that your
15   decision to sue the director of the jail -- as opposed to
16   the guy that did this to you -- has nothing to do with
17   the fact that you can gain more money by suing the jail
18   than suing the individual?  Is that your testimony?
19     A.  Yes.
20     Q.  Okay.  So you're not picking on, or you're not
21   choosing to sue the jail over the individual -- excuse
22   me.  Let me rephrase that.
23         Your decision to sue the director of the jail
24   as opposed to the guy that did this to you has nothing to

**Page 70**

1    do with money consideration.  Is that your testimony?
2      A.  No.
3      Q.  Okay.  So what is your testimony regarding
4    that?
5      A.  I'm suing Godinez because he refused to file,
6    to answer my grievance.
7          When I came back and forth from the joint, I
8    asked to speak to him.  I had my people to call up here
9    to speak to him.  He avoid calls.  What am I supposed to
10   do?
11     Q.  When you came up here, you asked people to call
12   Officer Godinez?
13     A.  Yes, the officers.  Could they have some type
14   of contact with him where I can speak to him, or a number
15   where I can get in contact with him -- Godinez.
16     Q.  And how soon -- and you said you asked those
17   people to call Officer Godinez after you got back here?
18     A.  Yes.
19     Q.  How long after the incident was it when you
20   were asking people to make phone calls to
21   Officer Godinez?
22     A.  It was like in January of '06.
23     Q.  So now we're talking about, what, at least
24   three months after the incident?

**Page 71**

1      A.  Yes.
2      Q.  You're back in the Cook County Jail?
3      A.  Yes.
4      Q.  And now you're asking people to call
5    Mr. Godinez about the incident?
6      A.  Yes.
7      Q.  And who did you ask to call Mr. Godinez?
8      A.  That lieutenant and that captain that was--
9      Q.  Which lieutenant did you ask?
10     A.  I don't remember.  He was on the morning shift.
11     Q.  You don't remember his name?
12     A.  No.
13     Q.  Which captain did you ask to call
14   Officer Godinez?
15     A.  I don't remember.
16     Q.  Anybody else besides the lieutenant and the
17   captain that you asked to call Officer Godinez?
18     A.  And my family from the world.
19     Q.  Who in your family did you ask to call
20   Officer Godinez?
21     A.  My father.
22     Q.  Your father?
23     A.  Yes.
24     Q.  And when did you ask your father to call

**Page 72**

1    Officer Godinez?
2      A.  As soon as I came back from the joint.
3      Q.  Did you have contact with your father while you
4    were at the joint?
5      A.  Yes.
6      Q.  While you were at the joint, that being the
7    Illinois Department of Corrections, did you ever ask your
8    mother or father to call Officer Godinez?
9      A.  No.
10     Q.  So the first time you asked your father to call
11   Officer Godinez was four months later when you got back
12   to the jail, correct?
13     A.  Yes.
14     Q.  Anybody else besides the unnamed captain -- the
15   two unnamed jail officials and your father that you asked
16   to call Officer Godinez?
17     A.  No.
18     Q.  Do you have any knowledge that those calls were
19   in fact made to Officer Godinez?
20     A.  No.
21     Q.  So you have no knowledge whether or not
22   Officer Godinez received any phone calls, correct?
23     A.  No.
24     Q.  Or do you have any knowledge that

## Page 73

1  Officer Godinez received any phone calls?
2    A.  No.
3    Q.  And according to you, the decision to sue the
4  director of the jail, as opposed to the guy that did this
5  to you, does money have anything to do with that
6  consideration?
7    A.  No.
8    Q.  Huh?
9    A.  No.
10   Q.  Does the fact that -- does the believe that you
11 could make more money by suing the director of jail, as
12 opposed to suing Paul Smith, does that have anything to
13 do with your decision of suing the director of the jail?
14   A.  No.
15   Q.  The grievance that you filed after the
16 incident, do you have a copy of that?
17   A.  No. I never get a copy of it.
18   Q.  With respect to the jaw problem that you've had
19 since 1983, the TMJ, have you ever had surgery for that
20 problem yet?
21   A.  **No. They be trying to get me surgery, but I**
22 **won't let them do it. They want to cut both sides of my**
23 **face.**
24   Q.  When you say they've been trying to give you

## Page 74

1  surgery, they've been trying to give you surgery for the
2  problem you've had since 2003, correct?
3    A.  **And the problem when I got it re-broke.**
4    Q.  Who's been trying to give you surgery?
5    A.  **The County.**
6    Q.  And you've continuously refused that surgery,
7  correct?
8    A.  **Yes.**
9        MR. DeBENEDETTO: I don't think I have anything
10 else.
11       Sir, you do have a -- the court reporter did a
12 very careful job in recording everything that you said.
13 You do have some rights.
14       You do have a right to have a copy of the
15 transcript typed up, and review it for any corrections,
16 but let me explain what I mean by corrections.
17       It is not like you can read the transcript and
18 decide that you didn't like, or you want to change your
19 answer to a question. That's not the type of review you
20 can do.
21       The type of review you can do is if you believe
22 you said one thing, and maybe the court reporter heard
23 you wrong and typed it up differently than what you
24 actually said. You can request those kinds of

## Page 75

1  corrections.
2        Do you understand what I'm saying?
3        THE WITNESS: Yes.
4        MR. DeBENEDETTO: Okay. You do have a right to
5  review the transcript for those clerical types of
6  corrections.
7        If you choose to exercise that right, a
8  transcript will be prepared for you. There is a fee for
9  preparation of the transcript. The fee for preparation
10 of a transcript will be billed to you because you're the
11 one requesting that transcript for the review.
12       You don't have to review the transcript. You
13 can also waive the right to review the transcript and
14 just trust that he transcribed everything accurately.
15       It's your decision. I'm not your lawyer. I
16 can't make that choice for you.
17       THE WITNESS: Yes.
18       MR. DeBENEDETTO: Do you want to review the
19 transcript? Are you reserving the right to review the
20 transcript, or are you waiving the right?
21       THE WITNESS: I'm waiving the right.
22       MR. DeBENEDETTO: Okay. That should do it.
23       AND FURTHER DEPONENT SAITH NOT.

## Page 76

1  STATE OF ILLINOIS   )
2                      ) SS.
3  COUNTY OF C O O K   )
4
5        I, THOMAS A. MANNO, C.S.R. and Notary Public,
6  do hereby certify that I reported in machine shorthand
7  the testimony held at the deposition of ARTHUR NEWBY
8  taken on May 23rd, 2008, and that this transcript is a
9  true and accurate transcription of my machine shorthand
10 notes so taken, to the best of my ability, and contains
11 all of the proceedings given at said deposition.
12       I further certify that this certificate applies
13 to the signed original and certified transcripts only.
14       I assume no responsibility for the accuracy of
15 any reproduced copies not made under my control or
16 direction.
17
18 _____
19 Thomas A. Manno, C.S.R.
20 No. 084-001174

THOMAS A. MANNO
MY COMMISSION EXPIRES
OCTOBER 25, 2010